## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## WESTERN DIVISION

**JEROME DUCK, JR.**                                                          **PLAINTIFF**

**v.**                                              **CIVIL ACTION NO.:5:13-cv-0065-KS-MTP**

**CAROLYN W. COLVIN**
**Acting Commissioner of Social Security Administration**                    **DEFENDANT**

### REPORT AND RECOMMENDATION

Plaintiff Jerome Duck, Jr. ("Duck") brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision of the Acting Commissioner of Social Security

Administration denying his claim for disability insurance benefits. The matter is now before the

Court on the Complaint [1], Plaintiff's Brief [10], and Defendant's Motion to Affirm the

Decision of the Commissioner [11].  Having considered the pleadings, the record and the

applicable law, and being fully advised in the premises, the undersigned recommends that the

Acting Commissioner's decision be AFFIRMED.

### PROCEDURAL HISTORY

On May 9, 2005, Plaintiff applied for a period of disability and disability insurance

benefits ("SSD"),[1] alleging disability as of April 1, 2005, due primarily to diabetes mellitus,

hypertension, impaired vision in his left eye, kidney failure and migraine headaches.

---

[1]Plaintiff also filed for Supplemental Security Income ("SSI") on April 21, 2008.  The
SSI is not in dispute, as Plaintiff received a fully favorable and uncontested decision granting SSI
on July 27, 2009.  (Administrative Record [9] at pp. 76-77).

(Administrative Record [9] at pp. 153-155, 187).[2]  Plaintiff's claim was denied initially and upon reconsideration. ([9] at pp. 82-85, and 91-93).  Thereafter, he requested a hearing before an Administrative Law Judge ("ALJ").  ([9] at p. 94).

On February 15, 2008, a hearing was convened before ALJ Lanier Williams.  The ALJ heard testimony from the Claimant and Joe Hargett, a vocational expert ("VE").  ([9] at pp. 626-698).  The Claimant's medical history was presented through the medical records and Mr. Duck's testimony.  In addition to the medical issues for which he initially claimed disability, the Claimant's diagnosis of major depressive disorder with psychotic features, as well as his obesity, were presented during the hearing.[3]  On February 29, 2008, the ALJ issued a decision finding that Plaintiff was not disabled. ([9] at pp. 51-61).[4]

The Claimant appealed; and on September 22, 2008, the Appeals Council granted the request for review, vacated the hearing decision, remanded the case to the ALJ to resolve three issues and directed the ALJ to: (1) evaluate Claimant's mental impairment in accordance with 20 C.F.R. § 404.1520(a); (2) give further consideration to Claimant's residual functional capacity ("RFC"), citing the record and applying the pertinent Social Security rulings and Code regulations; (3) evaluate Claimant's obesity in accordance with Social Security Ruling 02-1p,

---

[2] For ease of reference, the administrative record is cited to herein by reference to the Court's docket number and docket page number in the federal court record (not the Administrative Record page number).

[3]The issue of a heart attack in May 2005 was raised, and the ALJ pointed out that the heart attack was ruled out.  Counsel for the Claimant represented, "The claimant has also understood that he had a heart attack.  Until today no one has told him he never really did have a heart attack."  ([9] pp. 634, 641).

[4]The ALJ found that the Claimant had a combination of three severe impairments: diabetes; vision problems; and major depression. ([9] at p. 56).

determining its impact, if any, on claimant's RFC; (4) evaluate the "additional evidence received since the hearing in accordance with 20 C.F.R. § 404.1527";[5] and (5) obtain supplemental evidence from a VE with regard to transferable skills, if any, pursuant to the applicable Code regulations and Social Security rulings.  The ALJ was directed to offer the Claimant another opportunity for hearing.  ([9] at pp. 127-128).

A second hearing was held before ALJ Williams on June 3, 2009, at which both Mr. Duck and VE Hargett testified.  During the hearing, more medical evidence was presented; and counsel for the Claimant raised yet another possible diagnosis, "iatrogenic disorder,"[6] which he argued stemmed from Mr. Duck's "perception" that he had sustained a heart attack not long after the time of his alleged disability onset.  ([9] at pp. 699-793).  Pursuant to the ALJ's request, on June 6, 2009, counsel submitted information about iatrogenic disorder.  ([9] at pp. 147-148).  The ALJ rendered his decision on July 27, 2009, finding that the Claimant was not disabled within the meaning of the Social Security Act from April 1, 2005 through the date last insured, December 31, 2006.[7]  ([9] at pp. 62-77).

After the Claimant appealed the ALJ's second decision denying SSD ([9] at pp. 142-146),

---

[5]The record is unclear as to what "additional evidence" was submitted.

[6]Iatrogenic effect is preventable harm resulting from medical treatment or advice to patients. http://en.wikipedia.org/wiki/Iatrogenesis (last visited June 9, 2014).  It was argued that Mr. Duck had guarded himself, or "self-limited," because he had been told in error that he had sustained a heart attack.  ([9] at pp. 714-715.)

[7]This time, the ALJ found that the Claimant suffered from five severe impairments: diabetes; obesity; polyneuropathy; vision problems; and major depression. ([9] at p. 68). The ALJ found the Claimant had been disabled since April 21, 2008 and was therefore entitled to receive SSI.  He reasoned that the Claimant was limited to a light range of work during this time period, rendering him disabled pursuant to the Medical-Vocational Rule 202.06, when the other factors were considered.  ([9] at pp. 76-77).

the Appeals Council granted his request for review and vacated the decision with respect to the issue of disability on or before December 31, 2006.  ([9] at p. 79).  The matter was again remanded, and the Appeals Council directed the ALJ to: (1) give further consideration to the treating source opinion pursuant to 20 C.F.R. §§ 404.1427 and 416.927 and Social Security Rulings 96-2p and 96-5p, explaining the weight given to the opinion; (2) as appropriate, obtain evidence from a medical expert to clarify the nature and severity of Claimant's impairments; (3) further evaluate the Claimant's mental impairments and document specific findings thereto in accordance with 20 C.F.R. §§ 404.1420a and 416.920a; (4) give further consideration to the claimant's maximum RFC and provide a rationale with record references; and (5) as appropriate, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations, pursuant to the applicable Code regulations and Social Security rulings.  Finally, the Appeals Council directed that the matter be heard before a different ALJ.  ([9] at pp. 78-81).

ALJ James Barter presided over the third hearing on October 19, 2011.   Mr. Duck testified again, and VE Katina Virden testified.  The Claimant raised additional medical issues including back and arm pain and numbness.  ([9] at pp. 794-842).  The treating source, Dr. Moses Young, was not present.  Counsel represented that Dr. Young had been contacted and said that he "st[ood] by everything [he'd] written and [was] willing to provide a statement."  ([9] at p. 799).  On December 13, 2011, the ALJ wrote Dr. Young, seeking clarification about his diagnosis of peripheral neuropathy[8] and his statement that the Mr. Duck had sustained a heart

---

[8]Peripheral neuropathy is damage or disease affecting nerves, which may impair sensation, movement, gland or organ function. One common cause is diabetes. "Polyneuropathy" means that multiple nerve roots, thus both sides of the body, are affected. http://en.wikipedia.org/wiki/Peripheral_neuropathy (last visited June 9, 2014).

attack, among other things.  ([9] at pp. 517-518).   Dr. Young responded on December 22, 2011;

and the ALJ handed down his decision on April 26, 2012, finding that the Claimant was not

disabled and thus not entitled to SSD.[9]  ([9] at pp. 18-40).  The Claimant again appealed ([9] at

pp. 620-625); but this time the Appeals Council denied review, rendering ALJ Barter's decision

final.  ([9] at pp. 11-13).

Aggrieved by the Acting Commissioner's decision to deny benefits, Plaintiff filed a

Complaint in this Court on May 7, 2013, seeking a modification of the ALJ's decision, thereby

granting SSD, and other relief.  (Complaint [1] at pp. 4-5).  The Acting Commissioner answered

the Complaint, denying that Plaintiff is entitled to any relief.  (Answer [8]).  The parties having

briefed the issues in this matter pursuant to the Court's Order [4], the matter is now ripe for

decision.[10]

## MEDICAL/FACTUAL HISTORY

Plaintiff was sixty-one years old at the time of his third hearing before the ALJ on

October 19, 2011.  ([9] at p. 801).  His alleged disability onset date was April 1, 2005, when he

was fifty-five years old. ([9] at p. 813).  Plaintiff has a high school education and has past work

experience as a truck driver and more recently as a prison guard at Louisiana State Prison,

Angola.  ([9] at pp. 192, 653, 801, and 806-808).  Plaintiff alleges that he is disabled due to

---

[9]ALJ Barter found the Claimant had suffered from three severe impairments: obesity; diabetes mellitus; and depression.

[10]In his Complaint, Plaintiff also pled relief for SSI preceding the date of his application, April 21, 2008.  However, the issued is not briefed by either party.  In fact, references in both briefs indicate that SSI is not an issue.  ([10] at p. 2; Defendant's Memorandum in Support of the Commissioner's Decision [12] at p. 1, n. 1).  As Plaintiff did not present this issue for review pursuant to Order [4], it is deemed waived.

diabetes mellitus, hypertension, impaired vision in his left eye, kidney failure, migraine headaches, major depressive disorder with psychotic features, obesity, neuropathy/polyneuropathy, back pain, leg pain, arm numbness, dizziness, chest pain, inability to sleep for fear of death and iatrogenic disorder that caused deconditioning as a result of a perceived diagnosis of heart attack.  ([9] at pp. 187, 637-650, 655-681, 709, 714-715, 719, 731-742, 767-769, 789 and 809-830).

Plaintiff began treating with physicians at Jefferson Comprehensive Health Center, Inc. in Fayette, Mississippi ("Jefferson Health Center")[11] in August of 2001.  He requested medication for depression, stating a history of separation from his wife, four children in foster care, job loss and a problem with workers' compensation.  ([9] at pp. 344-345).  Records indicate that, at or before that time, he was diagnosed with major depression and diabetes mellitus; he was prescribed Paxil for depression and Glucotrol for diabetes.  He weighed 234 pounds.  ([9] at pp. 344-345).  In November 2001, he was diagnosed with hypertension; but no medication was prescribed.  His weight remained steady at 235 pounds.  ([9] at p. 349).  His physician prescribed Accupril for hypertension a year later, in November 2002, at which time Amaryl was added to his regime for blood sugar control relative to diabetes.  ([9] at p. 352).

 From 2002 through 2004, the Plaintiff returned to Jefferson Health Center regularly for medication refills, check-ups and an annual assessment.[12]  His blood pressure and blood sugar

---

[11]Jefferson Health Center is an FTCA Deemed Community Health Center, a grantee under 42 U.S.C. 254b, and a Deemed Public Health Services employee under 42 U.S.C. (g)-(n). https://www.jeffersoncomprehensivehealthcenter.com/index/php (last visited June 4, 2014).

[12]During this three-year period, Mr. Duck went to the clinic twenty-two times.  ([9] at pp. 350-360).

levels were stable and controlled through the year 2004 with the prescribed medications.[13] During this three-year period, his weight ranged from 231 to 239 pounds; and his height was recorded as 5 feet 8 inches.  In January 2002, the diagnosis of depression disappeared from his chart, as did the prescription for Paxil.  ([9] at pp. 350-360).  Although depression was mentioned again on April 4, 2002, September 5, 2002 and October 6, 2003, no medication was prescribed.[14]  ([9] at pp. 350-351, and 355).  The medical records otherwise remained silent regarding the depression diagnosis from 2002 through 2004.  ([9] at pp. 350-360).

Plaintiff had a check-up on February 5, 2005, which revealed some developments in his overall health condition.  According to lab work from December 2004, his diabetes was not optimally controlled, and he had elevated cholesterol and triglyceride levels.  A diagnosis of hyperlipidemia was added, as was the physician's impression that Mr. Duck was "overweight" at approximately 238 pounds.  ([9] at p. 361).  His plan that day was to increase the Glucotrol dosage, keep the same dosage of Accupril and perform some tests and additional lab work.  The physician noted that the patient needed medical examinations for his eyes and feet.[15]  Mr. Duck was to return in four weeks.  ([9] at p. 361).

The Plaintiff returned to Jefferson Health Center on April 25, 2005, complaining of dizziness, "feeling bad," and almost fainting for a period of three weeks.  ([9] at p. 362).  He

---

[13]Amaryl was never discontinued, but it was not specifically mentioned when he obtained refills; nor was it referenced in the physician's plans beginning in November 2003.

[14]Anxiety was referenced as well on October 6, 2003.

[15]There are other items noted in the plan, which may include a reference to glaucoma and the addition of baby aspirin.  However, the records are handwritten and not clearly discernable. ([9] at p. 361).  Also, there is no lab work nor test results in the medical records for February 3, 2005.

reported that his vision was blurry and that his last eye exam had been several years ago.  He had

not checked his blood sugar for a while because he was out of test strips and could not afford

them because he was unemployed.  Both his blood pressure and blood sugar were elevated; he

had onchomychosis,[16] but both feet were dry with no lesions and full distal pulses.  ([9] at pp.

362-363).   Lab tests revealed an extremely elevated microalbumin[17] level (89 with a reference

range of 0-17); and his hemoglobin A1c[18] was high, as it had been in December 2004.  ([9] at pp.

370-371).   The physician's plan included adding Glucophage for diabetes, taking Glucotrol

twice per day (as opposed to once daily), increasing the Accupril dosage, and adding Lipitor for

high cholesterol.  He was advised to get an eye exam "ASAP," follow up with a podiatrist, check

his feet daily, monitor his blood sugar daily and return in four-to-six weeks.  ([9] at pp. 362-363).

He followed up on May 23, 2005, complaining of eye problems, nausea, dizziness,

occasional vomiting and recent syncope (fainting).  He had checked his blood sugar a week

before and reported that he "[felt] well with no complaints."   It appears that an

electrocardiogram was performed at Jefferson Health Center.  The physician was concerned

about Mr. Duck's heart and admitted him to Jefferson County Hospital for tests to rule out a

---

[16]Onchomychosis is a fungal infection of the nails.
http://en.wikipedia.org/wiki/onchomychosis (last visited June 19, 2014).

[17]A microalbumin test checks the kidneys for albumin levels.  Albumin is normally found
in the blood and is filtered by the kidneys.  When kidneys are damaged, albumin leaks into the
urine.  http://www.webmd.com/diabetes/microalbumin-urine-test  (last visited June 3, 2014).

[18]The hemoglobin A1c test is an important blood test for measuring how well diabetes is
controlled.  It measures blood sugar control over a six-to-twelve week period, and is useful in
conjunction with home blood sugar tests to make adjustments in diabetes medications.
http://www.webmd.com/diabetes/guide/glycated-hemoglobin-test-hba1c  (last visited June 3,
2014).

myocardial infarction (heart attack).[19]  Ecotrin 81mg was added to his medication regime.  ([9] at p. 364).

At the hospital, Mr. Duck's reported history included two episodes of chest pain lasting up to one-half hour after taking Lipitor.[20]  Once, approximately two weeks before his admission, he had almost fainted.  His present medical history was noted to include "hypertensive heart disease."  Although he was asymptomatic during admission, he was transferred to the University of Mississippi Cardiology Department ("UMC") for "cardiac cauterization,"[21] because of abnormal cardiac enzymes.  His discharge diagnoses on May 24, 2005, were:  (1) abnormal EKG, suggestive of IWMI; (2) chest pain times 2; (3) "black out" spell times 1; (4) hyperlipidemia; (5) hypertension; and (6) NIDDM.  ([9] at p. 241).

Mr. Duck was pain free upon arrival to UMC on May 24, 2005.  He reported having gone to Dr. Francis at Jefferson Health Center because of chest tightness with substernal pain which radiated into his left arm.[22]  He advised that the pain started when he began taking Lipitor; the pain decreased when lying down and with Alka Seltzer.  ([9] at p. 255).  In fact, during his hospital course, he improved after taking Alka Seltzer.  ([9] at p. 245).  The issue of possible myocardial infarction was resolved, and found "not to be true."  ([9] at p. 244).  It was

---

[19]The handwritten notes are sometimes difficult to read.  However, it does appear that dextrose strips were given because Mr. Duck had not been checking his blood sugar level which was 275 at the clinic.  ([9] at p. 364).

[20]This history is not in the Jefferson Health Center records.  There, Mr. Duck complained primarily about gastrointestinal symptoms, as well as dizziness, syncope and eye problems.  The subjective portion of the May 23, 2005 physician's note is completely legible.

[21]This appears to be a typographical error, likely meant to be "cardiac catheterization."

[22]This is the first mention of radiating pain in conjunction with his alleged chest pain.

discovered that the leads had been transposed during the prior electrocardiogram, which resulted in a false reading.  His electrocardiogram at UMC was normal.  ([9] at pp. 244-245 and 261).  He was discharged in good condition on May 26, 2005, with an official diagnosis of "chest discomfort likely due to musculoskeletal pain" and  disposition diagnoses of "hypertension, chest discomfort secondary to gastrointestinal causes, [and] diabetes mellitus."  ([9] at pp. 244-245).  His discharge medications were Accupril; Glucotrol; Lopressor, lisinopril and hydrochlorothiazide for hypertension;[23] Pravachol for hyperlipidemia;[24] and sublingual nitroglycerin.[25]  He was to follow up with Dr. Francis in four weeks.  ([9] at p. 246).

At his appointment with Dr. Francis on June 30, 2005, he reported no further chest pains but stated he was "scheduled for cardiac catheterization."  ([9] at p. 365).  He also informed Dr. Francis that he had not taken the Prevachol, but had restarted Lipitor without any problems.  His blood pressure was 110/70; he weighed 233 pounds; and his fasting blood sugar was 189.  ([9] at p. 365).

Mr. Duck underwent a disability consultative examination on July 13, 2005, which was performed by Dr. Barry Tillman without having reviewed any of his medical records.  Mr. Duck said he was not seeing a doctor, but he gave  Dr. Tillman his medical history, which included

_____

[23]Lisinopril and hydrochlorothiazide combination is used to treat high blood pressure. Lisinopril relaxes blood vessels, while hydrochlorothiazide is a diuretic used to help lower blood pressure.  http://www.mayoclinic.org/drugs-supplements  (last visited June 3, 2014).

[24]Pravachol is a statin drug, a class of lipid-lowering compounds which reduce cholesterol biosynthesis.  http://www.rxlist.com/pravachol-drug.htm (last visited June 3, 3014).

[25]Nitroglycerin is used to prevent angina (chest pain) caused by coronary artery disease and to relieve angina that is already occurring.  http://www.mayoclinic.org/drugs-supplements (last visited June 3, 2014).

complaints of "pain all over [his] body"; diabetes, hypertension and declining kidney function that "ma[d]e [him] feel sick"; occasional migraine headaches; nausea without vomiting; irregular bowel movements without relief from laxatives; chest pain, substernal without radiation; and feeling "bad all the time."  He told Dr. Tillman that he had sustained a heart attack and needed a cardiac catheterization.  He had quit work for health reasons, stating that he had syncope (fainting) at work.  ([9] at p. 328).  Dr. Tillman performed a physical examination which was "relatively unremarkable except for his obesity."  ([9] at p. 329).  Mr. Duck weighed 235 pounds and was 68 inches tall.  His vision was 20/200 in his left eye and 20/40 in his right eye; his vision was uncorrected.  Dr. Tillman found no neurological deficits, good pulses in his extremities, clear mental state, no pain with straight leg raising and regular heart rhythm, among other things.  In concluding his "relatively unremarkable" examination, Dr. Tillman's impression referenced "multiple complaints" with background of constipation, hypertension and diabetes. ([9] at p. 329).

Pursuant to his disability application, Mr. Duck also underwent a psychiatric review on July 27, 2005, which was performed by Dr. S. H. McDonnieal.  Mr. Duck reported a diagnosis of depression for which he said he was currently being prescribed Paxil 20mg daily for depressed moods.  He also said he had never been treated in a mental health facility.  After the examination was complete, Dr. McDonnieal concluded that Mr. Duck had depression that did not precisely satisfy the diagnostic criteria, but that his impairment was not severe.  ([9] at pp. 330-343).

Mr. Duck continued to go to Jefferson Health Center for refills and check-ups.  On July 28, 2005, his blood pressure was 107/72; and his fasting blood sugar was up to 248.  ([9] at p. 366).  He followed up twice in September 2005.  His fasting blood sugar came down some, and

11

his angina was stable.  Dr. Francis referenced "disability status" without a clear explanation on

September 16, 2005.[26]  He missed a couple of appointments but returned on September 29, 2005.

Medications were refilled, and he was urged, without explanation, to make an appointment with

Natchez Mental Health.  ([9] at pp. 393-394).

Mr. Duck had an appointment with an M.D. at Southwest Mississippi Mental Health

Complex ("SMMHC")[27] on October 31, 2005.  He told the doctor that he could not sleep and was

having a lot of flashbacks, stating that years ago he had suffered from a nervous breakdown and

had been hospitalized in Jackson.  The flashbacks were to that period; people from the institution

looked like animals.[28]  He said he had been depressed and felt like he was about to die, and that

the depression had worsened since he had a myodardial infarction in May 2005.  He was afraid of

having another heart attack.  The doctor's impression was major depressive disorder with

psychotic features, and questionable bipolar II disorder.  He gave Mr. Duck some samples of

Lexapro and Seroquel to assist with sleep.  ([9] at pp. 379-381).  He improved by December 1,

2005, reporting improved mood and adequate sleep, but claimed that financial stress was a

---

[26]The notes are difficult to read, but it appears that Dr. Francis advised him to check with another medical provider.

[27]SMMHC is a non-profit, public service agency, with a sliding fee scale, based upon family income and number of family members.  It has clinics in several towns, including Natchez.  http://swmmc.org/About%20Us.html (last visited June 4, 2014).

[28]He testified under oath before ALJ Williams during his first disability hearing on February 15, 2008, that he had been institutionalized at Whitfield in the 1990's and received shock therapy.  He described, "[P]eople there today look like wolves that was [sic] up in there with me.  I can see people that look like sheeps [sic] that was [sic] up there with me." ([9] at p. 659).  He said he dealt with flashbacks every day, and said he was not exaggerating.  ([9] at p. 659).  No records from Whitfield or any other mental facility prior to SMMHC in 2005 were introduced into the record.

source of depression and worry.  Dr. Alfredo Rodriguez treated him that day, diagnosing him with major depression with mild psychotic features. Lexapro and Seroquel samples were given with a prescription for Mr. Duck to be put on SMMHC's assistance program.  ([9] at p. 379).

He continued treating with SMMHC through August 2006.  Improvement was noted in January 2006, when psychotic symptoms had disappeared and depressive symptoms had decreased.  ([9] at p. 378).  By March 2006, he reported that he was "doing beautifully" on the medication program.  There was no evidence of hallucinations or delusional thinking.  He had a calm affect and "good sleep."  ([9] at p. 377).  By June 2006, he was not taking any medication because he could not afford it.  The assistance program had denied him, and "SSI program [had] told him that because he draws $7000 on his retirement they cannot give him anything."  ([9] at p. 375).  He had also been denied Medicaid.  ([9] at p. 374).  Samples of Cymbalta and Seroquel were given, and a note was made to try another assistance program.  ([9] at p. 375).  By August, he told the doctor he still had a three-month supply of Lexapro and, therefore, was not taking Cymbalta.  He was stable with "no major symptoms of depression" and was to return in three months, but there are no more records from SMMHC.[29]  ([9] at pp. 372-373).

In the meantime, he had continued to obtain refills from Jefferson Health Center, where records indicate no medication changes, well-controlled blood pressure, stable weight ranging from 230-235 pounds and stable angina from January through July 2006.[30]  The records make no

---

[29]There is one note from March 2008 which was produced into the record with a psychiatric evaluation/questionnaire completed by Dr. Rodriguez in response to the disability examiner's request concerning treatment dates from March - April 2008.  ([9] at pp. 462-466).

[30]His visits to the clinic were sporadic.  There are no records from November and December 2005 nor March 2006.  Monthly appointments were missed in October 2005, as well as February, May, July and August 2006.

reference to his treatment, diagnosis or symptoms as reported to medical personnel at SMMHC. ([9] at pp. 458-461).  One occurrence of elevated blood sugar is noted on April 18, 2006.  ([9] at p. 460).

A week after his last appointment at SMMHC, on August 31, 2006, he returned to Jefferson Health Center, complaining of back pain and needing medication.  He weighed 230 pounds, his blood pressure was 161/88, and his fasting blood sugar was 178.  Dr. Francis ordered a spine x-ray, some lab work and refilled his medications, with instructions for Mr. Duck to return to the clinic in two weeks.  ([9] at p. 458).  He missed his appointment but picked up medications on October 26 and November 22, 2006.   These records indicate elevated cholesterol and blood pressure, as well as a little weight gain and blood sugar level of 160.  Dr. Francis noted, "Please keep scheduled appt."  ([9] at p. 457).  He skipped his next two appointments. ([9] at p. 456).[31]

Dr. Moses Young, a physician at Jefferson Health Center, authored an opinion on September 20, 2007, noting that Mr. Duck "was seen in our rural health clinic on August 1, 2001

---

[31]Mr. Duck's date of last insured was December 31, 2006; so his disability, if any, must have occurred prior to that date for him to receive SSD.  The record includes medical records from 2007 and 2008, mostly comprised of a few office notes from Jefferson Health Center ([9] at pp. 448-456), but also a hospitalization in April 2007 after he had fainted ([9] at pp. 397-447 and 382-384), as well as a radiology report and a lab report from January 2009 ([9] at pp. 504-506). Of note, Mr. Duck began obtaining Celexa and Seroquel from Jefferson Health Center, and a diagnosis of depression reappeared in his chart there in 2007.  He complained of upper back pain after lifting some weights on February 1, 2007.  The first time Dr. Moses Young's name appears legibly in the chart is on August 17, 2007, at which time diabetic tennis shoes were prescribed. He had a foot exam on August 23, 2007.  There is no mention of neuropathy or polyneuropathy. ([9] at pp. 448-456).  Mr. Duck showed mild arthritic narrowing at L5-S1 in 2009, and his blood glucose was within normal limits, with his hemoglobin A1c only mildly elevated.  ([9] at pp. 504-506).

14

with the following medical problems ... ."[32]  He then listed: (1) major depression; (2) diabetes

mellitus type II; (3) atheroscleroic [sic] cardiovascular disease "in which he suffered a heart

attack in May 2005"; (4) hypertension; and hyperlipidemia.  He opined that Mr. Duck was "total

[sic] disabled, not only physically[,] but mentally, psychologically and emotionally."  He said

Mr. Duck was "not able ever to seek any gainful employment because of his poor health."  He

concluded by deferring the Psychiatric/Psychological Impairment questionnaire to his Psychiatric

[sic] at the mental health clinic.  ([9] at pp. 385-387).

　　　Mr. Duck was subjected to another state medical consultation, which was conducted by

Dr. John A. Frenz on June 16, 2008.  Dr. Frenz did not review any medical records, imaging

procedures or medical test results, but took a history from the Plaintiff, physically examined him,

ran an electrocardiogram and x-rayed his chest.  His report was nine pages long, including a one-

page questionnaire concerning chest discomfort only, and two pages of test results.  ([9] at pp.

467-475).  On the day of the exam, Dr. Frenz found Mr. Duck's vision to be 20/40 in the right

eye and 20/70 in the left eye.   His physical exam and tests showed nothing out of the ordinary

except obesity, some arthralgic soreness in the shoulders and crepitation in the left knee.

However, his range of motion was normal without instability in all joints.  The EKG was normal,

and Mr. Duck's blood pressure was 122/76.  He had no pulse deficits in his extremities; his

neurologic evaluation revealed no impairments.  Dr. Frenz listed his impressions to include

remote myocardial infarction "by history," treated hypertension, remote history of low back

sprain, obesity, renal disease "by history," angina and visual acuity defect, "likely correctable

with appropriate lenses."  ([9] at pp. 467-472).  He opined that Mr. Duck's alleged "stabbing"

---

[32]He did not mention whether he had personally examined or treated Mr. Duck.

chest pain which allegedly was occurring "about every other day" "all day" was due to ischemic cardiovascular disease. In his opinion, Mr. Duck was limited to self care and light duty functions. ([9] at p. 473).

A second psychiatric review was performed by Dr. Lisa Yazdani on July 24, 2008, in conjunction with the applications for SSI and SSD. Dr. Yazdani found the Plaintiff suffered from major depressive disorder with psychotic features. ([9] at pp. 480-493). She also conducted a mental residual functional capacity assessment ("RFC") on July 24, 2008. Accordingly, she determined that Mr. Duck was moderately limited in the following areas: (1) ability to maintain attention and concentration for extended periods; (2) performance of activities within a schedule, maintaining regular attendance; (3) ability to complete a normal workday and workweek without psychologically based symptoms; (4) acceptance of instructions and properly responding to criticism from superiors; and (5) ability to get along with others. She found no significant impairments in the other fifteen categories. ([9] at pp. 476-479).

Another medical consultant review took place on August 7, 2008; it was performed by Dr. Cherilyn Hebert. An addendum on September 11, 2008 underscores that the UMC evaluation was finally received. The addendum explains that the possible myocardial infarction ("MCI") in 2005 had been ruled out as a result of the leads' having been switched, and further explains why the heart catheterization had not been done. ([9] at p. 494). Dr. Hebert had reviewed the medical source statement from Dr. Young. ([9] at p. 502). Dr. Hebert found that Mr. Duck could occasionally lift 50 pounds, frequently lift 25 pounds, sit and stand six hours in an eight-hour workday with limitations of occasional climbing and balancing. She found no visual limitations. ([9] at pp. 494-503). She thought Mr. Duck was partially credible and noted

16

that "he did not understand that UMC ruled out the 'MCI' in 2005 and did not think he had significant 'CAD' [coronary artery disease] – he has felt limited since that time . . . He has limited his activities and has resulting poor conditioning."[33]

Dr. Young completed a Multiple Impairment Questionnaire on February 4, 2009, indicating treatment dates from August 1, 2001 through January 15, 2009.  ([9] at pp. 507-514).  His diagnoses included: "(1) chronic depression; (2) diabetes mellitus with complications (neuropathy-nerve pain); (3) hypertension; (4) angina (chest pain); (5) gastroesophageal reflux disease; and (6) osteoarthritis," with a prognosis of "fair to poor – varies with degree of blood glucose control."  ([9 at p. 507).  Primary symptoms were listed as "polyneuropathy of his feet – manifest as parasthesia (burning, tingling sensation), lost [sic] of sense of touch, lost [sic] of temperature sensation, lost [sic] of vibration and position sense with pain and numbness," all as a result of poorly controlled long-standing hyperglycemia.  ([9] at pp. 508-509).

Dr. Young opined that Mr. Duck could sit and stand no more than two hours in an eight-hour workday, and that he would need to get up every ten-fifteen minutes for thirty minutes.  He could occasionally lift five-ten pounds and occasionally carry five-ten pounds, never lifting or carrying anything heavier.  ([9] at pp. 510-511).  His listed medications included neurontin for neuropathic pain; Mr. Duck had reported medication side effects of dizziness and unsteady gait.[34]

---

[33]It is unclear whether Dr. Hebert is referring to Mr. Duck's understanding and self-limiting up to and including the time of her evaluation, or his understanding and alleged self-limitation from May 2005 until February 18, 2008, when his attorney represented that he was finally aware of the error.

[34]There is nothing in the medical records made a part of the court record that references either a diagnosis of neuropathy/polyneuropathy or the medication neurontin.  The last medical record from Jefferson Health Center is from March 2008. ([9] at p. 448).

Among other opinions, Dr. Young opined that Mr. Duck was incapable of even "low stress" because he was "emotional [sic] labile." ([9] at p. 512).  He checked every limitation listed on the form, including an opinion that Mr. Duck needed to avoid wetness, noise, fumes, gases, humidity, temperature extremes and dust.  He concluded by stating that in his best medical opinion, the earliest date of symptoms and limitations he identified pursuant to the questionnaire was August 2001.  ([9] at p. 513).

Approximately one month later, on March 2, 2009, Dr. Young wrote a narrative report "to whom it may concern," stating that Mr. Duck had been treating at "our" rural health clinic since August 2001.  ([9] at pp. 515-516).  This time he named the diagnoses as: (1) major depression; (2) poorly controlled diabetes mellitus type II with vascular complications; (3) athersclerotic cardiovascular disease status post heart attack in May 2005: (4) hypertension; and (5) hyperlipidemia.  He reviewed symptoms and approaches and opined that Mr. Duck could sit and stand up to one hour total in a normal eight-hour workday and that Mr. Duck would need long breaks.  He discussed neurogenic pain and numbness in upper extremities and stated that Mr. Duck was limited to doing certain repetitive motions such as handling and fingering, and further opined that Mr. Duck had marked limitations in regard to several things such as grasping and reaching.  He also mentioned psychological impairments, opining that his symptoms would increase at work, resulting in absenteeism "more than three times a month."  ([9] at p. 515).  He concluded with an opinion that Mr. Duck was disabled and had been unable to sustain a competitive full time job since at least May 2005.  He said his Multiple Impairment

Questionnaire remained valid.[35]  ([9] at p. 515).

In response to ALJ Barter's request, Dr. Young wrote a letter addressing questions about the diagnosis of peripheral neuropathy and the alleged heart attack in 2005.  ([9] at pp. 541-542). Dr. Young recited his recollection of a conversation he had with Mr. Duck wherein he described problems with his legs while working at the prison in Angola.  The doctor then provided some textbook information about neuropathy and the hemoglobin A1c test.  The only objective data he provided was that Mr. Duck's glucose levels had been too high, according to some of his hemoglobin A1c tests, but he did not give dates for these elevated results.  He admitted he did not know about the records from UMC ruling out the heart attack and further admitted that, while Mr. Duck was seen at Jefferson Health Center, he was under the care of another physician there from May 23, 2005 to February 1, 2007.  ([9] at pp. 541-542).

## BURDEN OF PROOF

In *Harrell v. Bowen*, the Fifth Circuit detailed the shifting burden of proof that applies to disability determinations:

> An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act.  Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled.  In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):
>
> > 1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

---

[35]Dr. Young referenced his questionnaire as "dated January 17, 2008." ([9] at p. 516). There is no questionnaire in the record bearing that date; it is presumed Dr. Young was referring to his questionnaire dated February 4, 2009.

2.  An individual who does not have a 'severe impairment' will not be found to be disabled.

3.  An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

862 F.2d 471, 475 (5th Cir. 1988).  The claimant bears the burden at the first four steps, but the burden thereafter shifts to the Commissioner at step five. Once the Commissioner makes the requisite showing at step five, the burden shifts back to the claimant to rebut this finding.  *Perez v. Barnhart,* 415 F.3d 457, 461 (5th Cir.2005).  A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell,* 862 F.2d at 475 (citations omitted).

## ADMINISTRATIVE LAW JUDGE'S ANALYSIS

On January 4, 2012, after considering the testimony given at the October 13, 2011, hearing along with the medical and other records submitted, the ALJ rendered his decision that Plaintiff was not disabled. ([9] at pp. 20-40).  The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act though December 31, 2006.

The essential findings at the first three steps are not challenged.  At step one of the evaluation process,[36] the ALJ found that Plaintiff had not engaged in any substantial gainful

---

[36] The ALJ applied the evaluation process set forth in 20 C.F.R. §§ 404.1520(b).

activity from April 1, 2005, through his date last insured, December 31, 2006.[37]  At step two, the

ALJ found that Plaintiff suffered from the following severe impairments: obesity; diabetes

mellitus; and depression.  ([9] at p. 25).  At step three, the ALJ determined that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR §

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  ([9] at p. 33).

To make a determination at step four, the ALJ assessed Plaintiff's Residual Functional

Capacity ("RFC").[38]  The ALJ found that:

> through the date of last insured, the [C]laimant had the residual functional capacity
> to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except
> that he is limited to unskilled, low stress, non-production based work.

([9] at p. 35).  According to the ALJ, in making this finding, he considered all symptoms and the

extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence and also considered opinion evidence.[39]  ([9] at p. 35). With

regard to the opinions of Dr. Young, the ALJ addressed Dr. Young's September 20, 2007, letter

report in detail ([9] at p.7); analyzed the Multiple Impairment Questionnaire completed by Dr.

Young on February 4, 2009 ([9] at pp. 29-30); quoted from Dr. Young's letter dated March 2,

2009 ([9] at p. 30); and evaluated Dr. Young's letter addressed to ALJ Barter on December 22,

---

[37]Medical records from Natchez Community Hospital suggest that Mr. Duck may have
returned to the work force by April 14, 2007.  ([9] at pp. 398, 421 and 446).

[38] "Residual Functional Capacity" is defined in the Regulations as the most an individual
can still do despite the physical and/or mental limitations that affect what the individual can do in
a work setting. 20 C.F.R. § 416.945.

[39]20 C.F.R. §§ 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

2011.  He concluded that the opinions of Dr. Young were "not entitled to controlling, or even substantial weight, according to Social Security Ruling 96-2p."  ([9] at p. 32).

Further, the ALJ found that Plaintiff was not capable of performing any past relevant work.[40]  However, the ALJ found that jobs existed in significant numbers in the national economy that the Plaintiff could have performed.[41]  ([9] at p. 39).   Accordingly, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act. ([9] at p. 40).

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983).   To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established."  *Id*. (citations omitted).  However, "[a] finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted).  Conflicts in the evidence are for the Commissioner, not the courts, to resolve.  *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990). A court may not reweigh the evidence, try the issues *de novo*, nor substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision.

---

[40]20 C.F.R. § 404.1565.

[41]20 C.F.R. §§ 404.1569 and 404.1569(a).

22

*Harrell*, 862 F.2d at 475.  If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617.  Moreover, "'[p]rocedural perfection in administrative proceedings is not required' so long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988)).

## ANALYSIS

Plaintiff brings this action, arguing that the ALJ erred in making his determinations and the Acting Commissioner erred in accepting those determinations.  Plaintiff's arguments for reversing the Acting Commissioner's final decision are discussed below.

### Issue No. 1:   Whether the ALJ properly evaluated the treating physician's opinion

The Plaintiff asserts four points in support of his argument that the ALJ erred by not affording controlling weight to the opinions of Dr. Moses Young.  They are:

•     The ALJ improperly concluded that Dr. Young's opinions concerning the diagnosis of neuropathy was based on subjective complaints ([10] at pp. 10-12);

•     The ALJ failed to apply all the factors provided in 20 §§ 404.1527 and 416.927 ([10 at pp. 12-13);

•     The RFC was not supported by substantial evidence ([10] at pp. 13-14); and

•     The ALJ erred by not obtaining testimony from a medical expert ([10] at pp. 14).

The Plaintiff concluded his argument by stating that an RFC finding of medium exertional work is "untenable given his severe diabetic neuropathy and back pain."  ([10 at. P. 15).

Ordinarily, the opinions of a treating physician who is familiar with a claimant's treatments, injuries and responses should be accorded considerable weight in determining disability.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  However,

[t]here are exceptions to this principle. The ALJ may give less weight to a treating physician's opinion when "there is good cause shown to the contrary," as is the case when his statement as to disability is "so brief and conclusory that it lacks strong persuasive weight," is not supported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence. The ALJ may also reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is "leaning over backwards to support the application for disability benefits." The administrative fact finder is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly.

*Id.* at 485 (citations omitted).

In the case *sub judice*, the undersigned observes two facts that permeate each of Plaintiff's subpoints. First, Dr. Young's opinions with regard to Mr. Duck's alleged diagnosis of neuropathy and back pain during the relevant time period are not supported by any medically acceptable clinical laboratory diagnostic techniques. Second, the undersigned cannot disregard the fact that Dr. Young was not Mr. Duck's treating physician during the relevant time period. *See, e.g., Magallanes v. Bowen,* 881 F.2d 747, 754 (9th Cir. 1989) (Treating physician with no direct personal knowledge of Plaintiff's condition during relevant time period is "scarcely different from any non-treating physician with respect to that time period."); *Precour v. Colvin*, 3:12-CV-2666-L, 2013 WL 4007771 (N.D. Tex. Aug. 6, 2013) (little weight assigned to opinion of subsequent treating physician). In addition, a basic legal premise must be applied to each of Plaintiff's arguments, which is that the ALJ, as factfinder, has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (citing *Bradley v. Bowen,* 809 F.2d 1054, 1057 (5th Cir.1987).

Plaintiff first suggests error when the ALJ concluded that Dr. Young's opinions were

based upon subjective complaints.  While the Plaintiff points out no specific objective evidence to contradict the ALJ's decision, he argues that because the records were "mostly illegible," the case should be remanded for clarification and supplementation.

There is no reason to remand the case, as the medical records are sufficiently clear.  The records were illegible in spots, but Dr. Young was given the opportunity to supplement the record and clarify any important findings to substantiate his opinions.  The ALJ asked with regard to neuropathy, "Does the fact that you *had not diagnosed or treated this condition* in 2006 or 2007 change your opinion about the [C]laimant's ability to sit, stand and walk during the period prior to December 31, 2006?" ([9] at p. 517) (emphasis added).  He then asked that if Dr. Young's opinion remained unchanged, that Dr. Young identify the conditions he was treating in 2006 and 2007, asking for specific direction in the medical records to the treatments and respective treatment dates. ([9] at p. 517).

Dr. Young responded that he did not treat Mr. Duck until on or after February 1, 2007, because he was under the care of "another provider at our clinic."[42]  ([9] at p. 542).  Dr. Young identified nothing from the record to show that he or anyone else from Jefferson Health Center had treated Mr. Duck for neuropathy during the relevant time period.  Nor did he deny that there was no diagnosis of neuropathy.  He had access to the records and could have consulted the other physicians from Jefferson Health Center if he needed help in reading the notes.  The only objective evidence Dr. Young referenced from the medical records was comprised of undated references to elevated hemoglobin A1c levels, and the addition of insulin to his medical regimen.

---

[42]The record is clear that Mr. Duck's primary treating physician beginning before April 1, 2005 through December 31, 2006 was Dr. Francis.  ([9] at pp. 361-396 and 457-461).

Dr. Young connected neither of these references to treatment or diagnosis of neuropathy in Mr. Duck.  ([9] at p. 542).  If a diagnosis of or treatment for neuropathy had been in the medical records during the relevant time period, Dr. Young would have pointed it out to the ALJ.

Dr. Young began his letter to the ALJ by referencing a conversation with Mr. Duck, wherein Mr. Duck told him that he was "unable to sustain a competitive job while working at the prison as a correctional officer" because of pain, numbness and parasthesia in his legs. ([9] at p. 541).  Dr. Young did not point out anything in the medical records to verify this conversation.  In fact, this conversation is not mentioned in the medical records.[43]

Considering the foregoing, the undersigned finds no error in the ALJ's refusing to afford Dr. Young's opinions controlling or substantial weight based upon his observation that Dr. Young's opinions concerning Mr. Duck's functional limitations "appear[ed] to [have been] based on the [C]laimant's subjective complaints, rather than abnormalities established by medically acceptable, clinical and laboratory diagnostic techniques." (*See* [9] at p. 32).   The undersigned finds that there was substantial evidence to support the ALJ's finding in this regard.

Plaintiff cites *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) for the proposition that the ALJ must address six factors[44] when he determines not to give a treating physician's opinion controlling weight.  He argues that the ALJ did not consider the factors, which is grounds for

_____

[43]A comparison of Dr. Young's hand writing from the questionnaire and 2007 records to the 2005 and 2006 medical records suggests that Dr. Young saw Mr. Duck on April 25, 2005, whereupon he noted that Mr. Duck was unemployed.  These notes are legible, and there is no mention of numbness, leg pain, or parasthesia.  The extremities exam showed a toenail infection, and full distal pulses, no lesions and dry feet.  ([9] at pp. 362-363).

[44]20 C.F.R. § 404.1527(c) factors are:  (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors.

reversal. The Defendant demonstrates that the ALJ did apply the factors and refers to them in her brief. ([12] at pp. 16-20). The undersigned finds that the ALJ made no error because he had the benefit of other reliable medical and opinion evidence juxtaposed to Dr. Young's opinions.

*Newton* specifically states that the statutory steps must be followed "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *Qualls v. Astrue*, 339 F. App'x 461, 466 (5th Cir. 2009) (quoting *Newto*n, 209 F.3d at 453). In *Qualls*, the ALJ was presented with substantial evidence from other treating physicians which contradicted the opinion submitted. *Id*.

In reaching his decision, the ALJ factored in the opinions and objective findings of Drs. Frenz, Tillman, and Rodriguez, as well as the objective findings throughout the medical records. ([9] at pp. 31-32). Dr. Young rendered opinions relative to two primary medical conditions: (1) neuropathy/polyneuropathy resulting from diabetes mellitus/poorly-controlled blood sugar levels; and (2) and depression.

Regarding the former, both Drs. Tillman and Frenz reported the Claimant had a "normal neurological examination," and he had "no complaints relating to neuropathy in the extremities." ([9] at p. 31). The ALJ further noted that there were no "significant neurological abnormalities noted" in the hospital records. ([9] at p. 31). The ALJ referred to the "discrepancy between the report of Dr. Young and the remainder of the documentary medical evidence," as well as the fact that he "did not even treat the [C]laimant" during the relevant time period. ([9] at p. 31). He specifically emphasized the absence of an express diagnosis of peripheral neuropathy or significant abnormalities in the Plaintiff's neurological examinations during 2005 and 2006. This observation includes impressions of Dr. Francis, who was the Plaintiff's primary treating

physician and who was following him relative to his diagnosis of diabetes.  With regard to opinions about depression, the ALJ accurately heeded Dr. Young's deference to Dr. Rodriguez, whose impressions did not "reflect limitations of a mental nature, as described by Dr. Young." ([9] at p. 32).   There is substantial evidence throughout the record as a whole which contradicted Dr. Young's opinion, and the undersigned finds no error in the ALJ's decision to discount the opinions of Dr. Young.

The Plaintiff next argues that the RFC was not supported by substantial evidence, suggesting that the ALJ "impermissibly determined Plaintiff's RFC based on his own lay understanding."  ([10] at p. 13). The undersigned finds no merit to this argument.

 In making an RFC assessment, an ALJ must consider all symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe.  *Westover v. Astrue*, 4:11-CV-816-Y, 2012 WL 6553102 (N.D. Tex. Nov. 16, 2012) *report and recommendation adopted*, 4:11-CV-816-Y, 2012 WL 6553829 (N.D. Tex. Dec. 13, 2012) (citing 20 C.F.R. §§ 404.1529, 416 .929; SSR 96–7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96–8p at *5). The ALJ is permitted to draw reasonable inferences from the evidence in making his decision.  *Id*.  The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record.  *Id.* (citing *Muse v. Sullivan,* 925 F.2d 785, 790 (5th Cir.1991).

Substantial evidence supports the ALJ's finding.  As noted in his decision, the ALJ considered the objective medical evidence, the amount of prescribed medication and the

28

Plaintiff's subjective complaints.  He noted that the Plaintiff continued to drive and considered all the skills required to drive, from grip strength, to vision, to coordination required in operating foot controls, among other things.  ([9] at pp. 35-36).  Further, he noted that the medical records did not reflect the complaints of pain, disability and limitations he alleged at the hearing.  ([9] at p. 36).  The ALJ also had the benefit of Dr. Hebert's Medical Consultant Review from 2008, as well as mental RFC Assessment by Dr. Yazdani, both of which were contemplated in detail in his decision.  ([9] at pp. 8-9).  Dr. Hebert opined that the Plaintiff was capable of medium work with some restrictions, and Dr. Yazdani's found some moderate difficulties in maintaining social functioning.  These restrictions and difficulties were included in the RFC determined by the ALJ.  Overall, the record supports the ALJ's determination that the Plaintiff's allegations of pain and the severity of his impairments before December 31, 2006 were "not persuasive to the extent alleged." ([9] at p. 36).

Finally, the Plaintiff argues that his case be remanded because the ALJ should have "obtained testimony" from a medical expert as "ordered" by the Appeals Council. ([10 at p. 14). This argument is unpersuasive.  The Appeals Council directed, "As appropriate, obtain evidence from a medical expert to clarify the nature and severity of Claimant's impairments."  ([9] at p. 90).  No testimony was ordered, and the ALJ contacted Dr. Young for clarification as discussed, *supra*.  Thus, the ALJ followed the orders of the Appeals Council.  Social Security claimants usually have one opportunity to prove their disability. Otherwise, the administrative proceedings would become an "unending merry-go-round."  *Nehlig v. Comm'r of Soc. Sec. Admin.*, 40 F. Supp. 2d 841, 849 (E.D. Tex. 1999) (addressing the issue of new evidence produced after a decision has been rendered).

**Issue No. 2:     *Whether the ALJ improperly evaluated the Plaintiff's credibility***

As stated above, the ALJ found that Mr. Duck's allegations of pain and the severity of impairments were not persuasive to the extent alleged when viewed in light of the entire record. *See supra*.  An ALJ has "discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference." *Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir. 2001) (citations omitted).  If an ALJ rejects a claimant's testimony regarding pain, the ALJ must articulate the reasons for doing so.  *Falco v. Shalala,* 27 F.3d 160, 163-164 (5th Cir. 1994).  The ALJ is required to make "affirmative findings regarding a claimant's subjective complaints," *id.* at 163, and those findings "should be upheld if supported by substantial evidence." *Chambliss*, 269 F.3d at 522 (citation omitted).

The Plaintiff argues that the ALJ erred by not considering several factors – symptoms, limitations and activities of daily living -- and comparing them to the medical records, as required by SSR 96-7p.  ([10] at p. 16).  The ruling emphasizes that no symptom or combination of symptoms can be the basis of a disability ruling unless there are "medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produced the symptoms."  SSR 96-7p.  Only then is the ALJ required to evaluate the intensity, persistence and functionally limiting effects of the symptoms, which requires an assessment of the credibility of the claimant, considering the entire case record.  *Id*.

The ALJ found that the Plaintiff suffered from the severe impairments of obesity, diabetes mellitus and depression.  He found no evidence of neuropathy, polyneuropathy, impaired vision or myocardial infarction; and the record supported this determination.

Therefore, the symptoms he needed to evaluate were those caused by obesity, diabetes and depression.  The Plaintiff generally refers the Court to pages 7-8 of his brief, wherein he mentions a plethora of symptoms, including "feeling bad all the time," "problems with vision," "dizziness," "back pain," and "numbness in his right arm and both legs."  ([10 at pp. 7-8).

The undersigned finds that the ALJ evaluated the symptoms, even though many of them were not symptoms of obesity, diabetes or depression.  First, the ALJ considered Plaintiff's allegations of chest pain and blackout spells upon admission to Jefferson County Hospital in 2005.  He then found that the Plaintiff was pain free upon admission to UMC and asymptomatic during his hospitalization.  He felt better after taking Alka Seltzer and was discharged with chest discomfort "secondary to gastrointestinal causes and diabetes mellitus, or likely due to musculoskeletal pain."  ([9] at p. 25).   The ALJ also noted Plaintiff's continued reporting of past heart attack but that he was not treating with a cardiologist and had normal EKGs.  ([9] at p. 25, 27, 28).   Next, he noted that the Plaintiff did not experience any pain upon straight leg rising when being examined by Dr. Tillman, who also found no neurological deficits.  Nor did Dr. Frenz find any neurological deficits.  ([9] at pp. 26, 28).  Third, the ALJ addressed the diabetes issue, finding several physician notations of non-compliance with diabetes medications.  Fourth, the ALJ noted that Mr. Duck was treated for low back pain in 2006.  ([9] at p. 26).   Further, the ALJ included improvement with depression and psychotic features as he analyzed the Plaintiff's complaints, referencing specific reports of "doing beautifully," no hallucinations and no evidence of delusional thinking.  ([9] at p. 26).  He also noted the Plaintiff had never experience a

decompensation episode at work or in a worklike setting. ([9] at p. 28).[45]

The ALJ continued by factoring in Plaintiff's contentions that he was able to feed and dress himself, stand for fifteen minutes, walk one block, drive a car for twenty minutes and walk up three stairs, although he could not grocery shop or participate in housekeeping and maintenance activities.  ([9] at p. 28).  He contemplated Dr. Hebert's impression that the Plaintiff's allegations "were felt to be partially credible."  ([9] at p. 29).

He went through the Plaintiff's work history of walking up and down a cell block every hour during twelve-hour shifts. He noted a history of headaches dating back to Mr. Duck's truck driving days, as well as a reported history of shock treatment and alleged continuous flashbacks from the treatment.  He referenced Plaintiff's testimony about back pain which traveled down his legs almost causing him to fall at times, as well as Plaintiff's allegation that he has to lie down most of the time when he is home because of pain.  He included Plaintiff's assessment of his ability to lift five to ten pounds, sit for fifteen minutes and stand for fifteen minutes.  ([9] at pp. 30-31).  Further, his opinion virtually quoted every letter and report authored by Dr. Young.  ([9] at pp. 27 and 29).  He also fully considered the iatrogenic disorder evidence and argument advanced by Plaintiff's counsel.  He afforded it no weight citing a number of reasons, including the fact that iatrogenic disorder had not been diagnosed by any physician or medically acceptable source.  ([9] at p. 32).

In arriving at his decision, the ALJ "carefully considered the [C]laimant's allegations as

---

[45]Though not specifically referenced, the ALJ gave Mr. Duck the benefit of the doubt, considering his denial of prior mental hospitalization to Dr. McDonnieal, compared to a subsequent confession of shock therapy at Whitfield then causing hallucinations of sheep and wolves, this after having received Dr. McDonnieal's report that his depression was not severe.

to the nature, location, onset, duration, frequency and intensity of his pain and other symptoms and their precipitating and aggravating factors," as outlined in pages five through fifteen in his single-spaced decision. ([9] at p. 35).  He found that the Claimant's impairments produced some pain and other symptoms, but that they were not so severe as to prevent him from medium work with the restrictions described.  ([9] at p. 35).  The undersigned not only finds that the ALJ made affirmative findings regarding a claimant's subjective complaints and that the findings are supported by substantial evidence, but that he also articulated his reasons, considering the multiple alleged symptoms and limitations, as well as activities of daily living.

## CONCLUSIONS AND RECOMMENDATIONS

Based on the foregoing, the undersigned finds that the Commissioner's decision is supported by substantial evidence and utilizes correct legal standards.  It is, therefore, the recommendation of the undersigned that Defendant's Motion for an Order to Affirm the Decision of the Commissioner [11] be granted, the Complaint [1] be dismissed and the denial of benefits be affirmed.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules, any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the Judge, the Magistrate Judge and the opposing party.  The District Judge at the time may accept, reject, or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this court with instructions.  The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after

33

being served with a copy shall bar that party, except upon grounds of plain error, from attacking

on appeal the proposed factual findings and legal conclusions accepted by the district court to

which the party has not objected.  *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29

(5th Cir. 1996).

THIS the 19th  day of June, 2014.

s/ Michael T. Parker
United States Magistrate Judge