**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**JEROME DUCK, JR.**

**VS.**                                           **CIVIL ACTION NO. 5:13cv65-KS-MTP**

**CAROLYN W. COLVIN,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY**

### ORDER ACCEPTING MAGISTRATE JUDGE'S RECOMMENDATION AND DISMISSING CASE WITH PREJUDICE, ETC.

This cause is before the Court on Complaint [1] filed by Jerome Duck, Jr. ("Duck") seeking review of a final decision of the Acting Commissioner of the Social Security Administration, Plaintiff's brief [10] and Defendant's Motion to Affirm the Decision of the Commissioner [11], the Report and Recommendation [14] of Magistrate Judge Michael T. Parker, and Objection to the Report and Recommendation.  The Court has considered the pleadings and the record in this case and finds that the decision of the Acting Commissioner should be **affirmed.**

### PROCEDURAL HISTORY

On May 9, 2005, Plaintiff applied for a period of disability and disability insurance benefits ("SSD"),[1] alleging disability as of April 1, 2005, due primarily to diabetes mellitus, hypertension, impaired vision in his left eye, kidney failure and migraine headaches. (Administrative Record [9] at pp. 153-155, 187).[2]  Plaintiff's claim was denied initially and

---

[1] Plaintiff also filed for Supplemental Security Income ("SSI") on April 21, 2008.  The SSI is not in dispute, as Plaintiff received a fully favorable and uncontested decision granting SSI on July 27, 2009.  (Administrative Record [9] at pp. 76-77).

[2] For ease of reference, the administrative record is cited to herein by reference to the Court's docket number and docket page number in the federal court record (not the

upon reconsideration. ([9] at pp. 82-85, and 91-93). Thereafter, he requested a hearing before an Administrative Law Judge ("ALJ"). ([9] at p. 94).

On February 15, 2008, a hearing was convened before ALJ Lanier Williams. The ALJ heard testimony from the Claimant and Joe Hargett, a vocational expert ("VE"). ([9] at pp. 626-698). The Claimant's medical history was presented through the medical records and Mr. Duck's testimony. In addition to the medical issues for which he initially claimed disability, the Claimant's diagnosis of major depressive disorder with psychotic features, as well as his obesity, were presented during the hearing.[3] On February 29, 2008, the ALJ issued a decision finding that Plaintiff was not disabled. ([9] at pp. 51-61).[4]

The Claimant appealed; and on September 22, 2008, the Appeals Council granted the request for review, vacated the hearing decision, remanded the case to the ALJ to resolve three issues and directed the ALJ to: (1) evaluate Claimant's mental impairment in accordance with 20 C.F.R. § 404.1520(a); (2) give further consideration to Claimant's residual functional capacity ("RFC"), citing the record and applying the pertinent Social Security rulings and Code regulations; (3) evaluate Claimant's obesity in accordance with Social Security Ruling 02-1p, determining its impact, if any, on claimant's RFC; (4) evaluate the "additional evidence received since the hearing in accordance with 20 C.F. R. § 404.1527";[5] and (5) obtain supplemental

---

Administrative Record page number).

[3]The issue of a heart attack in May 2005 was raised, and the ALJ pointed out that the heart attack was ruled out. Counsel for the Claimant represented, "The claimant has also understood that he had a heart attack. Until today no one has told him he never really did have a heart attack." ([9] pp. 634, 641).

[4]The ALJ found that the Claimant had a combination of three severe impairments: diabetes; vision problems; and major depression. ([9] at p. 56).

[5]The record is unclear as to what "additional evidence" was submitted.

evidence from a VE with regard to transferable skills, if any, pursuant to the applicable Code regulations and Social Security rulings.  The ALJ was directed to offer the Claimant another opportunity for hearing.  ([9] at pp. 127-128).

A second hearing was held before ALJ Williams on June 3, 2009, at which both Mr. Duck and VE Hargett testified.  During the hearing, more medical evidence was presented; and counsel for the Claimant raised yet another possible diagnosis, "iatrogenic disorder,"[6] which he argued stemmed from Mr. Duck's "perception" that he had sustained a heart attack not long after the time of his alleged disability onset.  ([9] at pp. 699-793).  Pursuant to the ALJ's request, on June 6, 2009, counsel submitted information about iatrogenic disorder.  ([9] at pp. 147-148).  The ALJ rendered his decision on July 27, 2009, finding that the Claimant was not disabled within the meaning of the Social Security Act from April 1, 2005 through the date last insured, December 31, 2006.[7]  ([9] at pp. 62-77).

After the Claimant appealed the ALJ's second decision denying SSD ([9] at pp. 142-146), the Appeals Council granted his request for review and vacated the decision with respect to the issue of disability on or before December 31, 2006.  ([9] at p. 79).  The matter was again remanded, and the Appeals Council directed the ALJ to: (1) give further consideration to the treating source opinion pursuant to 20 C.F.R. §§ 404.1427 and 416.927 and Social Security

---

[6]Iatrogenic effect is preventable harm resulting from medical treatment or advice to patients. http://en.wikipedia.org/wiki/Iatrogenesis (last visited June 9, 2014).  It was argued that Mr. Duck had guarded himself, or "self-limited," because he had been told in error that he had sustained a heart attack.  ([9] at pp. 714-715.)

[7]This time, the ALJ found that the Claimant suffered from five severe impairments: diabetes; obesity; polyneuropathy; vision problems; and major depression. ([9] at p. 68). The ALJ found the Claimant had been disabled since April 21, 2008 and was therefore entitled to receive SSI.  He reasoned that the Claimant was limited to a light range of work during this time period, rendering him disabled pursuant to the Medical-Vocational Rule 202.06, when the other factors were considered.  ([9] at pp. 76-77).

Rulings 96-2p and 96-5p, explaining the weight given to the opinion; (2) as appropriate, obtain evidence from a medical expert to clarify the nature and severity of Claimant's impairments; (3) further evaluate the Claimant's mental impairments and document specific findings thereto in accordance with 20 C.F.R. §§ 404.1420a and 416.920a; (4) give further consideration to the claimant's maximum RFC and provide a rationale with record references; and (5) as appropriate, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations, pursuant to the applicable Code regulations and Social Security rulings.  Finally, the Appeals Council directed that the matter be heard before a different ALJ.  ([9] at pp. 78-81).

ALJ James Barter presided over the third hearing on October 19, 2011.   Mr. Duck testified again, and VE Katina Virden testified.  The Claimant raised additional medical issues including back and arm pain and numbness.  ([9] at pp. 794-842).  The treating source, Dr. Moses Young, was not present.  Counsel represented that Dr. Young had been contacted and said that he "st[ood] by everything [he'd] written and [was] willing to provide a statement."  ([9] at p. 799).  On December 13, 2011, the ALJ wrote Dr. Young, seeking clarification about his diagnosis of peripheral neuropathy[8] and his statement that the Mr. Duck had sustained a heart attack, among other things.  ([9] at pp. 517-518).   Dr. Young responded on December 22, 2011; and the ALJ handed down his decision on April 26, 2012, finding that the Claimant was not disabled and thus not entitled to SSD.[9]  ([9] at pp. 18-40).  The Claimant again appealed ([9] at pp. 620-625); but this time the Appeals Council denied review, rendering ALJ Barter's decision

---

[8]Peripheral neuropathy is damage or disease affecting nerves, which may impair sensation, movement, gland or organ function. One common cause is diabetes. "Polyneuropathy" means that multiple nerve roots, thus both sides of the body, are affected. http://en.wikipedia.org/wiki/Peripheral_neuropathy (last visited June 9, 2014).

[9]ALJ Barter found the Claimant had suffered from three severe impairments: obesity; diabetes mellitus; and depression.

final.  ([9] at pp. 11-13).

Aggrieved by the Acting Commissioner's decision to deny benefits, Plaintiff filed a Complaint in this Court on May 7, 2013, seeking a modification of the ALJ's decision, thereby granting SSD, and other relief.  (Complaint [1] at pp. 4-5).  The Acting Commissioner answered the Complaint, denying that Plaintiff is entitled to any relief.  (Answer [8]).  The parties having briefed the issues in this matter pursuant to the Court's Order [4], the matter is now ripe for decision.[10]

## <u>MEDICAL/FACTUAL HISTORY</u>

Plaintiff was sixty-one years old at the time of his third hearing before the ALJ on October 19, 2011.  ([9] at p. 801).  His alleged disability onset date was April 1, 2005, when he was fifty-five years old. ([9] at p. 813).  Plaintiff has a high school education and has past work experience as a truck driver and more recently as a prison guard at Louisiana State Prison, Angola.  ([9] at pp. 192, 653, 801, and 806-808).  Plaintiff alleges that he is disabled due to diabetes mellitus, hypertension, impaired vision in his left eye, kidney failure, migraine headaches, major depressive disorder with psychotic features, obesity, neuropathy/polyneuropathy, back pain, leg pain, arm numbness, dizziness, chest pain, inability to sleep for fear of death and iatrogenic disorder that caused deconditioning as a result of a perceived diagnosis of heart attack.  ([9] at pp. 187, 637-650, 655-681, 709, 714-715, 719, 731-742, 767-769, 789 and 809-830).

Plaintiff began treating with physicians at Jefferson Comprehensive Health Center, Inc.

---

[10]In his Complaint, Plaintiff also pled relief for SSI preceding the date of his application, April 21, 2008.  However, the issued is not briefed by either party.  In fact, references in both briefs indicate that SSI is not an issue.  ([10] at p. 2; Defendant's Memorandum in Support of the Commissioner's Decision [12] at p. 1, n. 1).  As Plaintiff did not present this issue for review pursuant to Order [4], it is deemed waived.

in Fayette, Mississippi ("Jefferson Health Center")[11] in August of 2001.  He requested medication for depression, stating a history of separation from his wife, four children in foster care, job loss and a problem with workers' compensation.  ([9] at pp. 344-345).  Records indicate that, at or before that time, he was diagnosed with major depression and diabetes mellitus; he was prescribed Paxil for depression and Glucotrol for diabetes.  He weighed 234 pounds.  ([9] at pp. 344-345).  In November 2001, he was diagnosed with hypertension; but no medication was prescribed.  His weight remained steady at 235 pounds.  ([9] at p. 349).  His physician prescribed Accupril for hypertension a year later, in November 2002, at which time Amaryl was added to his regime for blood sugar control relative to diabetes.  ([9] at p. 352).

 From 2002 through 2004, the Plaintiff returned to Jefferson Health Center regularly for medication refills, check-ups and an annual assessment.[12]  His blood pressure and blood sugar levels were stable and controlled through the year 2004 with the prescribed medications.[13]  During this three-year period, his weight ranged from 231 to 239 pounds; and his height was recorded as 5 feet 8 inches.  In January 2002, the diagnosis of depression disappeared from his chart, as did the prescription for Paxil.  ([9] at pp. 350-360).  Although depression was mentioned again on April 4, 2002, September 5, 2002 and October 6, 2003, no medication was prescribed.[14]  ([9] at pp. 350-351, and 355).  The medical records otherwise remained silent

---

[11]Jefferson Health Center is an FTCA Deemed Community Health Center, a grantee under 42 U.S.C. 254b, and a Deemed Public Health Services employee under 42 U.S.C. (g)-(n). https://www.jeffersoncomprehensivehealthcenter.com/index/php (last visited June 4, 2014).

[12]During this three-year period, Mr. Duck went to the clinic twenty-two times.  ([9] at pp. 350-360).

[13]Amaryl was never discontinued, but it was not specifically mentioned when he obtained refills; nor was it referenced in the physician's plans beginning in November 2003.

[14]Anxiety was referenced as well on October 6, 2003.

regarding the depression diagnosis from 2002 through 2004.  ([9] at pp. 350-360).

Plaintiff had a check-up on February 5, 2005, which revealed some developments in his overall health condition.  According to lab work from December 2004, his diabetes was not optimally controlled, and he had elevated cholesterol and triglyceride levels.  A diagnosis of hyperlipidemia was added, as was the physician's impression that Mr. Duck was "overweight" at approximately 238 pounds.  ([9] at p. 361).  His plan that day was to increase the Glucotrol dosage, keep the same dosage of Accupril and perform some tests and additional lab work.  The physician noted that the patient needed medical examinations for his eyes and feet.[15]  Mr. Duck was to return in four weeks.  ([9] at p. 361).

The Plaintiff returned to Jefferson Health Center on April 25, 2005, complaining of dizziness, "feeling bad," and almost fainting for a period of three weeks.  ([9] at p. 362).  He reported that his vision was blurry and that his last eye exam had been several years ago.  He had not checked his blood sugar for a while because he was out of test strips and could not afford them because he was unemployed.  Both his blood pressure and blood sugar were elevated; he had onchomychosis,[16] but both feet were dry with no lesions and full distal pulses.  ([9] at pp. 362-363).  Lab tests revealed an extremely elevated microalbumin[17] level (89 with a reference

---

[15]There are other items noted in the plan, which may include a reference to glaucoma and the addition of baby aspirin.  However, the records are handwritten and not clearly discernable.  ([9] at p. 361).  Also, there is no lab work nor test results in the medical records for February 3, 2005.

[16]Onchomychosis is a fungal infection of the nails.  http://en.wikipedia.org/wiki/onchomychosis (last visited June 19, 2014).

[17]A microalbumin test checks the kidneys for albumin levels.  Albumin is normally found in the blood and is filtered by the kidneys.  When kidneys are damaged, albumin leaks into the urine.  http://www.webmd.com/diabetes/microalbumin-urine-test  (last visited June 3, 2014).

range of 0-17); and his hemoglobin A1c[18] was high, as it had been in December 2004.  ([9] at pp.

370-371).   The physician's plan included adding Glucophage for diabetes, taking Glucotrol

twice per day (as opposed to once daily), increasing the Accupril dosage, and adding Lipitor for

high cholesterol.  He was advised to get an eye exam "ASAP," follow up with a podiatrist, check

his feet daily, monitor his blood sugar daily and return in four-to-six weeks.  ([9] at pp. 362-

363).

He followed up on May 23, 2005, complaining of eye problems, nausea, dizziness,

occasional vomiting and recent syncope (fainting).  He had checked his blood sugar a week

before and reported that he "[felt] well with no complaints."   It appears that an

electrocardiogram was performed at Jefferson Health Center.  The physician was concerned

about Mr. Duck's heart and admitted him to Jefferson County Hospital for tests to rule out a

myocardial infarction (heart attack).[19]  Ecotrin 81mg was added to his medication regime.  ([9] at

p. 364).

At the hospital, Mr. Duck's reported history included two episodes of chest pain lasting

up to one-half hour after taking Lipitor.[20]  Once, approximately two weeks before his admission,

he had almost fainted.  His present medical history was noted to include "hypertensive heart

---

[18]The hemoglobin A1c test is an important blood test for measuring how well diabetes is controlled.  It measures blood sugar control over a six-to-twelve week period, and is useful in conjunction with home blood sugar tests to make adjustments in diabetes medications. http://www.webmd.com/diabetes/guide/glycated-hemoglobin-test-hba1c  (last visited June 3, 2014).

[19]The handwritten notes are sometimes difficult to read.  However, it does appear that dextrose strips were given because Mr. Duck had not been checking his blood sugar level which was 275 at the clinic.  ([9] at p. 364).

[20]This history is not in the Jefferson Health Center records.  There, Mr. Duck complained primarily about gastrointestinal symptoms, as well as dizziness, syncope and eye problems.  The subjective portion of the May 23, 2005 physician's note is completely legible.

disease."   Although he was asymptomatic during admission, he was transferred to the University

of Mississippi Cardiology Department ("UMC") for "cardiac cauterization,"[21] because of

abnormal cardiac enzymes.  His discharge diagnoses on May 24, 2005, were:  (1) abnormal

EKG, suggestive of IWMI; (2) chest pain times 2; (3) "black out" spell times 1; (4)

hyperlipidemia; (5) hypertension; and (6) NIDDM.  ([9] at p. 241).

Mr. Duck was pain free upon arrival to UMC on May 24, 2005.  He reported having gone

to Dr. Francis at Jefferson Health Center because of chest tightness with substernal pain which

radiated into his left arm.[22]  He advised that the pain started when he began taking Lipitor; the

pain decreased when lying down and with Alka Seltzer.  ([9] at p. 255).  In fact, during his

hospital course, he improved after taking Alka Seltzer.  ([9] at p. 245).  The issue of possible

myocardial infarction was resolved, and found "not to be true."  ([9] at p. 244).  It was

discovered that the leads had been transposed during the prior electrocardiogram, which resulted

in a false reading.  His electrocardiogram at UMC was normal.  ([9] at pp. 244-245 and 261).  He

was discharged in good condition on May 26, 2005, with an official diagnosis of "chest

discomfort likely due to musculoskeletal pain" and  disposition diagnoses of "hypertension,

chest discomfort secondary to gastrointestinal causes, [and] diabetes mellitus."  ([9] at pp. 244-

245).  His discharge medications were Accupril; Glucotrol; Lopressor, lisinopril and

hydrochlorothiazide for hypertension;[23] Pravachol for hyperlipidemia;[24] and sublingual

---

[21]This appears to be a typographical error, likely meant to be "cardiac catheterization."

[22]This is the first mention of radiating pain in conjunction with his alleged chest pain.

[23]Lisinopril and hydrochlorothiazide combination is used to treat high blood pressure.
Lisinopril relaxes blood vessels, while hydrochlorothiazide is a diuretic used to help lower blood
pressure.  http://www.mayoclinic.org/drugs-supplements  (last visited June 3, 2014).

[24]Pravachol is a statin drug, a class of lipid-lowering compounds which reduce
cholesterol biosynthesis.  http://www.rxlist.com/pravachol-drug.htm (last visited June 3, 3014).

nitroglycerin.[25]  He was to follow up with Dr. Francis in four weeks.  ([9] at p. 246).

At his appointment with Dr. Francis on June 30, 2005, he reported no further chest pains but stated he was "scheduled for cardiac catheterization."  ([9] at p. 365).  He also informed Dr. Francis that he had not taken the Prevachol, but had restarted Lipitor without any problems.  His blood pressure was 110/70; he weighed 233 pounds; and his fasting blood sugar was 189.  ([9] at p. 365).

Mr. Duck underwent a disability consultative examination on July 13, 2005, which was performed by Dr. Barry Tillman without having reviewed any of his medical records.  Mr. Duck said he was not seeing a doctor, but he gave Dr. Tillman his medical history, which included complaints of "pain all over [his] body"; diabetes, hypertension and declining kidney function that "ma[d]e [him] feel sick"; occasional migraine headaches; nausea without vomiting; irregular bowel movements without relief from laxatives; chest pain, substernal without radiation; and feeling "bad all the time."  He told Dr. Tillman that he had sustained a heart attack and needed a cardiac catheterization.  He had quit work for health reasons, stating that he had syncope (fainting) at work.  ([9] at p. 328).  Dr. Tillman performed a physical examination which was "relatively unremarkable except for his obesity."  ([9] at p. 329).  Mr. Duck weighed 235 pounds and was 68 inches tall.  His vision was 20/200 in his left eye and 20/40 in his right eye; his vision was uncorrected.  Dr. Tillman found no neurological deficits, good pulses in his extremities, clear mental state, no pain with straight leg raising and regular heart rhythm, among other things.  In concluding his "relatively unremarkable" examination, Dr. Tillman's impression referenced "multiple complaints" with background of constipation, hypertension and diabetes.

---

[25]Nitroglycerin is used to prevent angina (chest pain) caused by coronary artery disease and to relieve angina that is already occurring.  http://www.mayoclinic.org/drugs-supplements (last visited June 3, 2014).

([9] at p. 329).

Pursuant to his disability application, Mr. Duck also underwent a psychiatric review on July 27, 2005, which was performed by Dr. S. H. McDonnieal.  Mr. Duck reported a diagnosis of depression for which he said he was currently being prescribed Paxil 20mg daily for depressed moods.  He also said he had never been treated in a mental health facility.  After the examination was complete, Dr. McDonnieal concluded that Mr. Duck had depression that did not precisely satisfy the diagnostic criteria, but that his impairment was not severe.  ([9] at pp. 330-343).

Mr. Duck continued to go to Jefferson Health Center for refills and check-ups.  On July 28, 2005, his blood pressure was 107/72; and his fasting blood sugar was up to 248.  ([9] at p. 366).  He followed up twice in September 2005.  His fasting blood sugar came down some, and his angina was stable.  Dr. Francis referenced "disability status" without a clear explanation on September 16, 2005.[26]  He missed a couple of appointments but returned on September 29, 2005. Medications were refilled, and he was urged, without explanation, to make an appointment with Natchez Mental Health.  ([9] at pp. 393-394).

Mr. Duck had an appointment with an M.D. at Southwest Mississippi Mental Health Complex ("SMMHC")[27] on October 31, 2005.  He told the doctor that he could not sleep and was having a lot of flashbacks, stating that years ago he had suffered from a nervous breakdown and had been hospitalized in Jackson.  The flashbacks were to that period; people from the

---

[26]The notes are difficult to read, but it appears that Dr. Francis advised him to check with another medical provider.

[27]SMMHC is a non-profit, public service agency, with a sliding fee scale, based upon family income and number of family members.  It has clinics in several towns, including Natchez.  http://swmmc.org/About%20Us.html (last visited June 4, 2014).

institution looked like animals.[28]   He said he had been depressed and felt like he was about to

die, and that the depression had worsened since he had a myodardial infarction in May 2005.   He

was afraid of having another heart attack.   The doctor's impression was major depressive

disorder with psychotic features, and questionable bipolar II disorder.   He gave Mr. Duck some

samples of Lexapro and Seroquel to assist with sleep.   ([9] at pp. 379-381).   He improved by

December 1, 2005, reporting improved mood and adequate sleep, but claimed that financial

stress was a source of depression and worry.   Dr. Alfredo Rodriguez treated him that day,

diagnosing him with major depression with mild psychotic features. Lexapro and Seroquel

samples were given with a prescription for Mr. Duck to be put on SMMHC's assistance

program.   ([9] at p. 379).

   He continued treating with SMMHC through August 2006.   Improvement was noted in

January 2006, when psychotic symptoms had disappeared and depressive symptoms had

decreased.   ([9] at p. 378).   By March 2006, he reported that he was "doing beautifully" on the

medication program.   There was no evidence of hallucinations or delusional thinking.   He had a

calm affect and "good sleep."   ([9] at p. 377).   By June 2006, he was not taking any medication

because he could not afford it.   The assistance program had denied him, and "SSI program [had]

told him that because he draws $7000 on his retirement they cannot give him anything."   ([9] at

p. 375).   He had also been denied Medicaid.   ([9] at p. 374).   Samples of Cymbalta and Seroquel

were given, and a note was made to try another assistance program.   ([9] at p. 375).   By August,

_____

   [28]He testified under oath before ALJ Williams during his first disability hearing on
February 15, 2008, that he had been institutionalized at Whitfield in the 1990's and received
shock therapy.   He described, "[P]eople there today look like wolves that was [sic] up in there
with me.   I can see people that look like sheeps [sic] that was [sic] up there with me."   ([9] at p.
659).   He said he dealt with flashbacks every day, and said he was not exaggerating.   ([9] at p.
659).   No records from Whitfield or any other mental facility prior to SMMHC in 2005 were
introduced into the record.

he told the doctor he still had a three-month supply of Lexapro and, therefore, was not taking Cymbalta.  He was stable with "no major symptoms of depression" and was to return in three months, but there are no more records from SMMHC.[29]  ([9] at pp. 372-373).

In the meantime, he had continued to obtain refills from Jefferson Health Center, where records indicate no medication changes, well-controlled blood pressure, stable weight ranging from 230-235 pounds and stable angina from January through July 2006.[30]  The records make no reference to his treatment, diagnosis or symptoms as reported to medical personnel at SMMHC.  ([9] at pp. 458-461).  One occurrence of elevated blood sugar is noted on April 18, 2006.  ([9] at p. 460).

A week after his last appointment at SMMHC, on August 31, 2006, he returned to Jefferson Health Center, complaining of back pain and needing medication.  He weighed 230 pounds, his blood pressure was 161/88, and his fasting blood sugar was 178.  Dr. Francis ordered a spine x-ray, some lab work and refilled his medications, with instructions for Mr. Duck to return to the clinic in two weeks.  ([9] at p. 458).  He missed his appointment but picked up medications on October 26 and November 22, 2006.   These records indicate elevated cholesterol and blood pressure, as well as a little weight gain and blood sugar level of 160.  Dr. Francis noted, "Please keep scheduled appt."  ([9] at p. 457).  He skipped his next two appointments.

---

[29]There is one note from March 2008 which was produced into the record with a psychiatric evaluation/questionnaire completed by Dr. Rodriguez in response to the disability examiner's request concerning treatment dates from March - April 2008.  ([9] at pp. 462-466).

[30]His visits to the clinic were sporadic.  There are no records from November and December 2005 nor March 2006.  Monthly appointments were missed in October 2005, as well as February, May, July and August 2006.

([9] at p. 456).[31]

Dr. Moses Young, a physician at Jefferson Health Center, authored an opinion on September 20, 2007, noting that Mr. Duck "was seen in our rural health clinic on August 1, 2001 with the following medical problems ... ."[32]  He then listed: (1) major depression; (2) diabetes mellitus type II; (3) atheroscleroic [sic] cardiovascular disease "in which he suffered a heart attack in May 2005"; (4) hypertension; and hyperlipidemia.  He opined that Mr. Duck was "total [sic] disabled, not only physically[,] but mentally, psychologically and emotionally."  He said Mr. Duck was "not able ever to seek any gainful employment because of his poor health."  He concluded by deferring the Psychiatric/Psychological Impairment questionnaire to his Psychiatric [sic] at the mental health clinic.  ([9] at pp. 385-387).

Mr. Duck was subjected to another state medical consultation, which was conducted by Dr. John A. Frenz on June 16, 2008.  Dr. Frenz did not review any medical records, imaging procedures or medical test results, but took a history from the Plaintiff, physically examined him, ran an electrocardiogram and x-rayed his chest.  His report was nine pages long, including a one-page questionnaire concerning chest discomfort only, and two pages of test results.  ([9] at pp.

---

[31]Mr. Duck's date of last insured was December 31, 2006; so his disability, if any, must have occurred prior to that date for him to receive SSD.  The record includes medical records from 2007 and 2008, mostly comprised of a few office notes from Jefferson Health Center ([9] at pp. 448-456), but also a hospitalization in April 2007 after he had fainted ([9] at pp. 397-447 and 382-384), as well as a radiology report and a lab report from January 2009 ([9] at pp. 504-506). Of note, Mr. Duck began obtaining Celexa and Seroquel from Jefferson Health Center, and a diagnosis of depression reappeared in his chart there in 2007.  He complained of upper back pain after lifting some weights on February 1, 2007.  The first time Dr. Moses Young's name appears legibly in the chart is on August 17, 2007, at which time diabetic tennis shoes were prescribed. He had a foot exam on August 23, 2007.  There is no mention of neuropathy or polyneuropathy. ([9] at pp. 448-456).  Mr. Duck showed mild arthritic narrowing at L5-S1 in 2009, and his blood glucose was within normal limits, with his hemoglobin A1c only mildly elevated.  ([9] at pp. 504-506).

[32]He did not mention whether he had personally examined or treated Mr. Duck.

467-475).  On the day of the exam, Dr. Frenz found Mr. Duck's vision to be 20/40 in the right

eye and 20/70 in the left eye.   His physical exam and tests showed nothing out of the ordinary

except obesity, some arthralgic soreness in the shoulders and crepitation in the left knee.

However, his range of motion was normal without instability in all joints.  The EKG was normal,

and Mr. Duck's blood pressure was 122/76.  He had no pulse deficits in his extremities; his

neurologic evaluation revealed no impairments.  Dr. Frenz listed his impressions to include

remote myocardial infarction "by history," treated hypertension, remote history of low back

sprain, obesity, renal disease "by history," angina and visual acuity defect, "likely correctable

with appropriate lenses."  ([9] at pp. 467-472).  He opined that Mr. Duck's alleged "stabbing"

chest pain which allegedly was occurring "about every other day" "all day" was due to ischemic

cardiovascular disease.  In his opinion, Mr. Duck was limited to self care and light duty

functions.  ([9] at p. 473).

A second psychiatric review was performed by Dr. Lisa Yazdani on July 24, 2008, in

conjunction with the applications for SSI and SSD.  Dr. Yazdani found the Plaintiff suffered

from major depressive disorder with psychotic features.  ([9] at pp. 480-493).  She also

conducted a mental residual functional capacity assessment ("RFC") on July 24, 2008.

Accordingly, she determined that Mr. Duck was moderately limited in the following areas: (1)

ability to maintain attention and concentration for extended periods; (2) performance of activities

within a schedule, maintaining regular attendance; (3) ability to complete a normal workday and

workweek without psychologically based symptoms; (4) acceptance of instructions and properly

responding to criticism from superiors; and (5) ability to get along with others.  She found no

significant impairments in the other fifteen categories.  ([9] at pp. 476-479).

Another medical consultant review took place on August 7, 2008; it was performed by

Dr. Cherilyn Hebert.  An addendum on September 11, 2008 underscores that the UMC

evaluation was finally received.  The addendum explains that the possible myocardial infarction

("MCI") in 2005 had been ruled out as a result of the leads' having been switched, and further

explains why the heart catheterization had not been done.  ([9] at p. 494).  Dr. Hebert had

reviewed the medical source statement from Dr. Young.  ([9] at p. 502).  Dr. Hebert found that

Mr. Duck could occasionally lift 50 pounds, frequently lift 25 pounds, sit and stand six hours in

an eight-hour workday with limitations of occasional climbing and balancing.  She found no

visual limitations.  ([9] at pp. 494-503).  She thought Mr. Duck was partially credible and noted

that "he did not understand that UMC ruled out the 'MCI' in 2005 and did not think he had

significant 'CAD' [coronary artery disease] – he has felt limited since that time . . . He has

limited his activities and has resulting poor conditioning."[33]

Dr. Young completed a Multiple Impairment Questionnaire on February 4, 2009,

indicating treatment dates from August 1, 2001 through January 15, 2009.  ([9] at pp. 507-514).

His diagnoses included: "(1) chronic depression; (2) diabetes mellitus with complications

(neuropathy-nerve pain); (3) hypertension; (4) angina (chest pain); (5) gastroesophageal reflux

disease; and (6) osteoarthritis," with a prognosis of "fair to poor – varies with degree of blood

glucose control."  ([9 at p. 507).  Primary symptoms were listed as "polyneuropathy of his feet –

manifest as parasthesia (burning, tingling sensation), lost [sic] of sense of touch, lost [sic] of

temperature sensation, lost [sic] of vibration and position sense with pain and numbness," all as a

result of poorly controlled long-standing hyperglycemia.  ([9] at pp. 508-509).

--------

[33]It is unclear whether Dr. Hebert is referring to Mr. Duck's understanding and self-limiting up to and including the time of her evaluation, or his understanding and alleged self-limitation from May 2005 until February 18, 2008, when his attorney represented that he was finally aware of the error.

Dr. Young opined that Mr. Duck could sit and stand no more than two hours in an eight-hour workday, and that he would need to get up every ten-fifteen minutes for thirty minutes.  He could occasionally lift five-ten pounds and occasionally carry five-ten pounds, never lifting or carrying anything heavier.  ([9] at pp. 510-511).  His listed medications included neurontin for neuropathic pain; Mr. Duck had reported medication side effects of dizziness and unsteady gait.[34]  Among other opinions, Dr. Young opined that Mr. Duck was incapable of even "low stress" because he was "emotional [sic] labile."  ([9] at p. 512).  He checked every limitation listed on the form, including an opinion that Mr. Duck needed to avoid wetness, noise, fumes, gases, humidity, temperature extremes and dust.  He concluded by stating that in his best medical opinion, the earliest date of symptoms and limitations he identified pursuant to the questionnaire was August 2001.  ([9] at p. 513).

Approximately one month later, on March 2, 2009, Dr. Young wrote a narrative report "to whom it may concern," stating that Mr. Duck had been treating at "our" rural health clinic since August 2001.  ([9] at pp. 515-516).  This time he named the diagnoses as: (1) major depression; (2) poorly controlled diabetes mellitus type II with vascular complications; (3) athersclerotic cardiovascular disease status post heart attack in May 2005: (4) hypertension; and (5) hyperlipidemia.  He reviewed symptoms and approaches and opined that Mr. Duck could sit and stand up to one hour total in a normal eight-hour workday and that Mr. Duck would need long breaks.  He discussed neurogenic pain and numbness in upper extremities and stated that Mr. Duck was limited to doing certain repetitive motions such as handling and fingering, and further opined that Mr. Duck had marked limitations in regard to several things such as grasping

---

[34]There is nothing in the medical records made a part of the court record that references either a diagnosis of neuropathy/polyneuropathy or the medication neurontin.  The last medical record from Jefferson Health Center is from March 2008. ([9] at p. 448).

and reaching.  He also mentioned psychological impairments, opining that his symptoms would increase at work, resulting in absenteeism "more than three times a month."  ([9] at p. 515).  He concluded with an opinion that Mr. Duck was disabled and had been unable to sustain a competitive full time job since at least May 2005.  He said his Multiple Impairment Questionnaire remained valid.[35]  ([9] at p. 515).

In response to ALJ Barter's request, Dr. Young wrote a letter addressing questions about the diagnosis of peripheral neuropathy and the alleged heart attack in 2005.  ([9] at pp. 541-542).  Dr. Young recited his recollection of a conversation he had with Mr. Duck wherein he described problems with his legs while working at the prison in Angola.  The doctor then provided some textbook information about neuropathy and the hemoglobin A1c test.  The only objective data he provided was that Mr. Duck's glucose levels had been too high, according to some of his hemoglobin A1c tests, but he did not give dates for these elevated results.  He admitted he did not know about the records from UMC ruling out the heart attack and further admitted that, while Mr. Duck was seen at Jefferson Health Center, he was under the care of another physician there from May 23, 2005 to February 1, 2007.  ([9] at pp. 541-542).

## STANDARD OF PROOF AND REVIEW

This Court's review is limited to the inquiry of whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence.  *Hollis v. Bowen* 837 F. 2d 1378, 1382 (5th Cir. 1988).  To be substantial evidence, the evidence "must do more than create a suspicion of the evidence of the fact to be established." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).  However, "[a] finding of no

---

[35]Dr. Young referenced his questionnaire as "dated January 17, 2008." ([9] at p. 516).  There is no questionnaire in the record bearing that date; it is presumed Dr. Young was referring to his questionnaire dated February 4, 2009.

substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). Conflicts in the evidence are for the Commissioner, not the Courts, to resolve. *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990). A court may not reweigh the evidence, try the issues *de novo*, nor substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell*, 862 F.2d at 475. If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617. Moreover, "'[p]rocedural perfection in administrative proceedings is not require' so long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue,* 501 F.3d 446, 448 (5th Cir. 2007).

## PLAINTIFF'S OBJECTIONS AND ANALYSIS

The two issues raised in the Plaintiff's Objections are as follows:

POINT 1: The ALJ failed to follow the Treating Physician Rule;  and

POINT 2: The ALJ failed to properly evaluate Mr. Duck's credibility.

This case is a relatively simple case involving a man with a litany of aliments that troubled him during the number of years relevant to this case. He presented numerous times to numerous physicians with various complaints causing him various degrees of difficulty. His primary objection is that the Administrative Law Judge, and subsequently Judge Parker, did not accept the opinions of the treating physician, Dr. Young.

There were actually three hearings before Administrative Law Judges in this case. The third hearing was before ALJ James Barter in October of 2011. Judge Barter replaced the previous Administrative Law Judge and the directions from the Appeals Counsel were as follows:

1.      To give further consideration to the treating source opinion pursuant to 20 C.F.R.

§§ 404.1427 and 416.927 and Social Security Rulings 96-2p and 96-5p,

explaining the weight given to the opinions;

2.  As appropriate, obtain evidence from the medical expert to clarify the nature and

severity of claimant's impairments;

3.  Further evaluate the claimant's mental impairments and document specific

findings thereto in accordance with 20 C.F.R. §§ 404.1420a and 416.920a;

4.  Give further consideration to the claimant's maximum RFC and provide a

rationale with record references; and

5.  As appropriate, obtain supplemental evidence from a VE to clarify the effect of

the assessed limitation, pursuant to the applicable Code regulations and Social

Security rulings.

Finally, the Appeals Council directed that the matter be heard before a different ALJ and

this different ALJ was Judge Barter.

Judge Barter heard the case and rendered an opinion which put very little stock in the

testimony of the treating physician, Dr. Young. It should be noted that Dr. Young did not begin

treating the claimant until after his eligibility for disability ceased.   Plaintiff alleges that he is

disabled due to diabetes mellitus, hypertension, impaired vision in his left eye, kidney failure,

migraine headaches, major depressive disorder with psychotic features, obesity, neuropathy or

polyneuropathy, back pain, leg pain, arm numbness, dizziness, chest pain, inability to sleep for

fear of death and iatrogenic disorder that caused deconditioning as a result of a previous

diagnosis of heart attack.  He was primarily treated at the Jefferson County Health Center, Inc.,

beginning in August of 2001.  He was treated sporadically over the years for the different

ailments, some of which significantly and adversely affected his life.  One notable diagnosis was

that he had a heart attack, but it was later rebutted by a subsequent doctor, indicating that the leads on the cardiogram equipment were crossed.  The medical history is up and down with some appointments showing that the Plaintiff has significant problems and others showing that he was doing well.

The issue for this court to decide is whether or not there is substantial evidence to support the finding of the Commissioner.  The Plaintiff alleges that the Administrative Law Judge unduly discounted the testimony of Dr. Young, who was Plaintiff's treating physician beginning in 2007.  On September 20, 2007, Dr. Young offered an opinion which listed major depression, diabetes mellitus type 2, atherosclerotic [sic] cardiovascular disease "in which he suffered a heart attack in May of 2005," hypertension and hyperlipidemia.  The doctor opined that Mr. Duck was total [sic] disabled, not only physically, but mentally, psychologically, and emotionally."  He said Mr. Duck was "not able ever to seek any gainful employment because of his poor health."

The trouble with this doctor's opinion is that it is not backed up by the medical records, either before or after his treatment.  An obvious issue is the credibility of Dr. Young.  His diagnosis and opinion starkly contrast the opinions of other medical providers who have evaluated or treated Mr. Duck.  The opinion of Dr. Young is not validated by objective medical criteria and the ALJ and Magistrate Judge, for good reason, chose to discount the opinion of Dr. Young.  There is substantial evidence justifying the decision made by the Administrative Law Judge to discount said opinion.  It is significantly contradicted by numerous other doctors and Dr. Young's opinion has very little, if any, objective medical basis.

The bottom line is, the Administrative Law Judge did not believe the treating physician because of the significant contradictions of other medical tests and doctors.  This Court finds that said actions by the Administrative Law Judge were justified and reasons are replete in the record.

Consequently, the Court finds that the ALJ properly evaluated the treating physician's opinion.

The second objection from Mr. Duck is that the ALJ improperly evaluated the credibility of Mr. Duck.  Mr. Duck's medical records went all over the chart and some of the time he stated that he was doing terribly and other times he stated that he was doing "beautifully."  The main problem with Mr. Duck's testimony is that it is not backed up by objective medical findings. This Court finds that there was adequate proof in the record for the way that the Administrative Law Judge evaluated Mr. Duck's credibility and the Court finds that there is no basis in this objection.

## **CONCLUSION**

As required by 28 U.S.C. § 636(b)(1) this Court has conducted an independent review of the entire record and a *de novo* review of the matters raised by the objections.  For the reasons set forth above, this Court concludes that Mr. Duck's objections lack merit and should be overruled.  The Court further concludes that the proposed Report and Recommendation is an accurate statement of the facts and the correct analysis of the law in all regards.  Therefore, the Court accepts, approves, and adopts the Magistrate Judge's Factual Findings and Legal Conclusions contained in the Report and Recommendations.

Accordingly, it is ordered that the United States Magistrate Judge Michael T. Parker's Report and Recommendation is accepted pursuant to 28 U.S.C. § 636(b)(1) and that Jerome Duck, Jr.'s claim is dismissed with prejudice and the decision of the Commissioner of Social Security Commission denying Plaintiff Social Security disability benefits is affirmed.

SO ORDERED AND ADJUDGED this the 31st day of July, 2014.

*S/ Keith Starrett*
UNITED STATE DISTRICT JUDGE